# EXHIBIT A

MODIFICATION AGREEMENT

THIS MODIFICATION AGREEMENT, dated as of August 12, 2010, by and between Sovereign Business Capital, division of Sovereign Bank, with a place of business at 214 Carnegie Center, Suite, 302, Princeton, New Jersey 08540, hereinafter called "Bank," and Fletcher Granite Company, LLC, a Massachusetts Limited Liability Company, and Fletcher Granite Company of Georgia, LLC, a Georgia Limited Liability Company, hereinafter individually and collectively the "Borrower" and debtor Fletcher Granite Company, LLC, a debtor in possession in the United States Bankruptcy Court for the District of Massachusetts.

RECITALS

WHEREAS, Bank and Borrower entered into a Loan and Security Agreement dated as of August 30, 2006 (said agreement as amended or modified from time to time the "Loan Agreement"), which sets forth the terms and conditions of, among other things, a revolving credit facility by Bank to Borrower; and

WHEREAS, on August 2, 2010, (the "Petition Date"), Borrower Fletcher Granite Company, LLC filed a petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts, Case No. 10-43884 and said Borrower has retained possession of its assets and is authorized under Sections 1107 and 1108 of the Bankruptcy Code to continue the management and operation of its business as debtor in possession; and

WHEREAS, Borrower has requested that Bank modify the Loan Agreement to provide for new debtor in possession financing, under a revolving credit facility through October 30, 2010 in the maximum amount of up to $417,355.00 as shown on the most recent 13 week Budget (the "Budget") prepared by the Borrower and delivered to the Bank a copy of which is annexed as Exhibit "B" to the *Motion for Order Authorizing Debtor to Obtain Post-Petition Financing with Administrative Superpriority and Secured by Liens on All Assets of the Debtor and Other Relief* (the "Motion") together with a $50,000.00 Carve Out which credit facility will provide working capital for Borrower during its Chapter 11 case; and

WHEREAS, Bank has approved the application of the Borrower and has agreed to provide such financing upon the terms and conditions set forth in the Loan Agreement as modified by this Modification Agreement (sometimes hereafter referred to as the "DIP Loan Agreement") and other Loan Documents, and upon the entry of and subject to the terms of a Financing Order acceptable in all respects to Bank.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the parties hereto adopt the above recitals and agree as follows:

1.  Capitalized terms not defined herein but defined in the Loan Agreement or in any Financing Order shall have the same meanings ascribed to such terms in the Loan Agreement or Financing Order. Reference is also hereby made to a certain Revolving Credit Master Promissory Note dated August 30, 2006 in the stated amount of $7,000,000.00 (the "Revolving Note"), a certain Term Loan Promissory Note in the stated amount of $8,000,000.00 (the "Term Loan A Note") and a certain Term Loan Promissory Note dated May

1

21, 2007 in the stated amount of $240,000.00 (the "Term Loan B Note") as said notes (collectively, the "Notes") have been amended, modified and restated from time to time.

2. Borrower hereby acknowledges and confirms that Borrower is indebted to Bank for obligations under the Loan Agreement, as of the date hereof, in respect of Obligations owing as of the Petition Date in the principal amount of $6,982,340.91 plus interest accrued and accruing thereon, costs, expenses, fees (including in-house and outside counsel fees and expenses) and all other charges owed by Borrower to Bank under the Loan Agreement, all of which are unconditionally owing by Borrower to Bank, without offset, defense or counterclaim of any kind, nature or description whatsoever. Obligations owed for principal, interest and certain fees and expenses as of August 2, 2010 under each of the Notes are as follows:

|           | Revolving Note | Term Loan A Note | Term Loan B Note | Total |
|---|---|---|---|---|
| Principal | $3,635,412.23 | $3,258,928.68 | $88,000.00 | $6,982,340.91 |
| Interest  | $ 1,819.53 | $ 1,584.20 | $ 42.78 | $ 3,446.51 |
| Fees      | $ 1,700.00 |  |  | $ 1,700.00 |
| Appraisal | $ 3,000.00 |  |  | $ 3,000.00 |
| Total     | $3,641,931.76 | $3,260,512.88 | $88,042.78 | $6,990,487.42 |

3. Borrower hereby acknowledges, confirms and agrees that Bank has and shall continue to have valid, enforceable and perfected first priority (subject only to liens or security interests expressly permitted under the Loan Agreement, or any other validly perfected and enforceable liens with priority over Bank's liens (the "Permitted Prior Liens")) senior security interests in and liens upon all prepetition Collateral heretofore granted to Bank for the benefit of Bank, pursuant to the Loan Agreement and other Loan Documents (as in effect immediately prior to the Petition Date) to secure all of the Obligations, as well as valid and enforceable first priority and senior security interests in and liens upon all post-petition Collateral granted to Bank for the benefit of Bank, under the Financing Order, and/or under any of the other Loan Documents or otherwise granted to or held by Bank for the benefit of the Bank.

4. The Loan Agreement, as modified hereby, shall be deemed adopted and assumed in full by Borrower, as debtor and debtor-in-possession.

5. **The definition of Termination Date in section 1.1 of the Loan Agreement is hereby modified to read as follows:**
   Termination Date means the earlier of (a) October 30, 2010 unless such date is extended pursuant to section 3.1 hereof, and if so extended on one or more occasions the last date of the last such extension, or (b) if earlier terminated by the Bank upon the occurrence of an Event of Default pursuant to section 9.1 hereof, the date of such termination.

6. Article I of the Loan Agreement is hereby modified to add the following definitions:

*Avoidance Actions* means recoveries from, or settlements of, actions commenced by, or on behalf of, Borrower's bankruptcy estate under Chapters 5 or 7 of the Bankruptcy Code, including, without limitation, Sections 544, 545, 547, 548, 549, 550 or 724 of the Bankruptcy Code.

*Bankruptcy Code* means Title 11, United States Code.

*Bankruptcy Court* means the United States Bankruptcy Court for the District of Massachusetts, or such other court having jurisdiction over the Case.

*Budget Default* means with respect to the Budget: (A) if actual collections and/or sales are less

2

than ninety percent (90%) of budgeted collections and/or sales for any week during the Budget, provided, that during the four week period between the week ending August 7, 2010 through the week ending August 28, 2010, there shall be no Budget Default based upon collections and sales unless actual collections and sales are less than eighty percent (80%) of budgeted collections and sales during said four week period; and/or (B) if actual disbursements are more than one hundred and ten percent (110%) of budgeted disbursements for any week during the Budget; and /or (C), the Borrower shall otherwise have failed to comply with the Budget.

*Case* means Borrower's reorganization case under Chapter 11 of the Bankruptcy Code pending in the Bankruptcy Court.

*Collateral* means all existing and future assets of Borrower of all kind (as debtor and debtor-in-possession and before and after the Petition Date) including without limitation, real estate and personal property, all Pre-Petition Collateral and DIP Collateral as defined in the Financing Order, all proceeds of Avoidance Actions which are Collateral or which are or traceable to Pre-Petition Collateral and all other choses in action.

*Financing Order* means a non-appealable order authorizing, *inter alia*, the granting of credit by Bank to Borrower pursuant to Section 364 of the Bankruptcy Code, entered by the Bankruptcy Court in the Case in form satisfactory to Bank in its sole and absolute discretion, as may be continued or revised with the consent of Bank, and any subsequent order pursuant to Section 364 of the Bankruptcy Code, that is consented to by Bank in its sole and absolute discretion and may include either or both an Interim Financing Order and a Final Financing Order. The effectiveness of this Agreement is subject to entry by the Bankruptcy Court of the Financing Order.

*Super-Priority Administrative Expense* means a claim against Borrower or its estate in its Case which is an administrative expense claim having priority over any now existing or hereafter arising (i) administrative expenses allowed pursuant to Section 105, 330, 331, 503(b), 506(c), 507 or 726 of the Bankruptcy Code, and (ii) unsecured claims now existing or hereafter arising, including, without limitation, administrative expenses of the kind specified in Section 503(b), 506(c) or 507(b) of the Bankruptcy Code.

*Pre-Petition Revolving Obligations* means all Obligations of Borrower to Bank with respect to Advances prior to the Petition Date under the revolving credit facility provided for in Section 2.1 of the Loan Agreement and included within the Pre-Petition Obligations as defined in the Financing Order.

*Post-Petition Revolving Obligations* means all Obligations of Borrower to Bank with respect to Advances after the Petition Date under the revolving credit facility provided for in Section 2.1 of the Loan Agreement and defined as DIP Loans and DIP Obligations in the Financing Order.

7. Sections 2.1, 2.4(A), and 3.1 of the Loan Agreement are hereby modified to read as follows:

**2.1  Revolving Advances; Advance Limit.** Upon the request of Borrower, made at any time from and after the date hereof until the Termination Date, Bank shall make Advances pursuant to the Budget in an amount up to $417,355.00 (said dollar limit the *Advance Limit*), except that the Bank may elect to fund any professional fee Carve Out from the sale proceeds of Collateral. Prior to making any Advance after the Petition Date, the Bankruptcy Court shall have entered an interim and, if applicable, final Financing Order and such Financing Order shall be in full force and effect shall not have been amended, modified, stayed or reversed without the prior written consent of Bank .

**2.4  Interest.**
A. Except where specified to the contrary in the Loan Documents, the aggregate outstanding balances of the Obligations shall accrue interest at the per annum rate of five and one half (5.5) percentage points above the Prime Rate which is the "Default Rate" under the Loan Agreement, as amended. All interest payable under the Loan Documents shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed on the Daily Balance. Interest as provided for herein shall continue to accrue until the Obligations are paid in full.

3

...

3.  **TERM**

    3.1    **Term and Renewal Date.** This Agreement shall become effective upon execution by Bank and entry of the Financing Order and continue in full force through the Termination Date. This Agreement may be extended by mutual written agreement of the parties. In addition, Bank shall have the right to terminate this Agreement upon two (2) business days notice upon the occurrence of an Event of Default. No such termination shall relieve or discharge Borrower of its duties, Obligations and covenants hereunder until all Obligations have been paid and performed in full, and Bank's continuing liens security interests in the Collateral shall remain in effect until the Obligations have been fully and irrevocably paid and satisfied in cash or cash equivalent.

8.    Borrower agrees that notwithstanding any terms of the Loan Agreement to the contrary Borrower shall, or Bank at its option may, notify all Account debtors that Accounts owing to Borrower have been collaterally assigned to Bank and the Account debtors are to remit payments on Accounts to a lockbox designated by and under the exclusive control of Bank, and if, notwithstanding said notice, Borrower obtains payment of an Account or other Collateral all payments on Accounts and other Collateral are to be held in trust by Borrower for Bank and forwarded to Bank (with any necessary endorsement) by overnight delivery and/or at Bank's discretion deposited into a blocked deposit account in the name of and under the exclusive control of Bank. All such payments shall be applied by Bank to the Obligations in accordance with Section 2.6 of the Loan Agreement, and shall be applied first to the Pre-Petition Revolving Obligations and second to the Post-Petition Revolving Obligations. Interest, and all fees and expenses, on the Obligations shall continue to accrue and be payable as set forth in the Loan Agreement subject to the terms of the Financing Order.

9.    Article 6, ("Affirmative Covenants") of the Loan Agreement is hereby modified to add Section 6.14 as follows:

    6.14    **Compliance with Bankruptcy Court.** Borrower shall comply in full with the notice and other requirements of the Bankruptcy Code and all other applicable rules with respect to any relevant Financing Order in a manner acceptable to Bank and its counsel. Borrower shall timely file all monthly reports required by the office of the United States Trustee and contemporaneously supply Bank with copies of same and Borrower shall timely comply with other financial reporting requirements in any Financing Order.

10.    Article 7, ("Negative Covenants"), of the Loan Agreement is hereby modified to delete existing Section 7.15 titled "Minimum Debt Service Coverage Ratio."

11.    Article 8 of the Loan Agreement ("Events of Default") is hereby modified to delete Sections 8.1 though 8.18 and to substitute in their place Sections 8.1 through 8.13 as follows:

(1)    The Borrower shall file (or any other Person shall obtain a court order approving) any of the following: (A) a request for approval of any modification, stay, vacation or amendment to any Financing Order, without the Bank's written consent, (B) a disclosure statement or plan which does not provide for the full, final, and indefeasible repayment of all Obligations immediately upon the effectiveness of such plan, (C) a request for approval or allowance of any Claim or Lien ranking equal or senior to the Bank's Claims and Liens under any Financing Order, or any motion or adversary proceeding or other pleading that asserts affirmative claims for recovery against the Bank for any reason, exclusive of the Carve Out, (D) a request to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, or (E) any request for relief from the automatic stay as to any material portion of the Collateral or for use of cash Collateral without the Bank's written consent; or

(2)    The Court shall not have entered an Interim Financing Order on or before August 17, 2010, the Interim Financing Order shall not have become a Final Financing Order (or, if the Final Financing Order is a separate order, the Final Financing Order shall not have been entered) on or before September 4, 2010 or any Final Financing Order shall for any reason cease to be in full force and effect from and after the Court's

4

entry thereof or shall be the subject of an appeal, motion to alter, amend, reconsider, modify or vacate such Financing Order; or

(3) Any statement, representation, warranty, or financial information provided by Borrower, shall be incorrect or misleading in any material respect when made or Borrower shall have failed to disclose a fact, where such omission renders the statement, representation or warranty misleading or the Borrower shall fail to timely provide the Bank with any financial reporting required by any Financing Order; or

(4) The Borrower shall default in the payment or performance of any part of the DIP Obligations under any Financing Order; or

(5) The Borrower shall hereafter breach any covenant, term, condition, restriction, or prohibition contained in any Financing Order or in the DIP Loan Agreement, or in any other existing or future agreement with the Bank; or

(6) Any case of any Borrower shall be dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code; or

(7) The appointment of any one or more of the following for the Borrower or for any portion of the assets of any Borrower: (A) a trustee pursuant to Bankruptcy Code §§ 1104(1)(1) or 1104(a)(2); or (B) an examiner with special powers pursuant to Bankruptcy Code § 1104(a); or

(8) There shall occur a Budget Default or the Borrower shall have accrued post-petition and not paid expenses in an amount unacceptable to the Bank in its sole discretion or the Bank otherwise determines that the DIP Loan Agreement is no longer in its best interests; or

(9) The occurrence of any loss, theft, or destruction of, or damage to, any substantial portion of the Collateral for which there is either no insurance coverage or for which, in the opinion of the Bank, there is insufficient insurance coverage; or

(10) Any levy, seizure, or attachment upon any Collateral by any third party; or

(11) The Borrowers' failure to file with the Court a motion seeking to sell all or substantially all of its assets on or before September 17, 2010; or

(12) The O'Connor Group or any principal thereof, or a successor reasonably acceptable to the Bank, shall, for any reason, no longer serve as CRO or interim manager of or consultant to the Borrower; or

(13) The termination or cessation of all or substantially all of the operations of the Borrower, whether by voluntary act(s) or omission(s) of the Borrower, or otherwise.

12. Article 9.1 of the Loan Agreement ("BACC'S Rights and Remedies") is hereby modified to delete Section 9.1 in its entirety and to substitute in its place a new Section 9.1, as follows:

9.1 Bank's Rights and Remedies. Upon two (2) business days written notice of the occurrence of an Event of Default, which notice shall state unambiguously and without condition Bank's intention to terminate this Agreement, given by Bank to the U. S. Trustee, counsel to the Debtors, and counsel to the Official Unsecured Creditors Committee (the "Committee") appointed in the Debtor's Case by hand, telecopier, email, or other means reasonably intended to provide immediate delivery, Bank may, at its election and without any further notice or demand and without further order of the Bankruptcy Court do any one or more of the following:

5

(a)     Declare all Obligations whether arising pre-petition or post-petition, including, without limitation any Pre-Petition Obligations and DIP Obligations, whether evidenced by this Agreement or otherwise, immediately due and payable in full;

(b)     Cease advancing money (making DIP Loans) or extending credit to or for the benefit of Borrower under the DIP Loan Agreements, the Loan Documents or under any other agreement between Borrower and Bank;

(c)     Terminate this Agreement as to any future liability or obligation of Bank, exclusive of the Carve Out but without affecting Bank's rights and liens and security interests in the Collateral and without affecting the Obligations;

(d)     Settle or adjust disputes and claims directly with Account debtors for amounts and upon terms which Bank considers advisable and, in such cases, Bank will credit the Obligations with the net amounts received by Bank in payment of such disputed Accounts, after deducting all Bank expenses;

(e)     Cause Borrower to hold all returned Inventory in trust for Bank, segregate all returned Inventory from all other property of Borrower or in Borrower's possession and conspicuously label said returned Inventory as the property of Bank;

(f)     Without notice to or demand upon Borrower, make such payments and do such acts as Bank considers necessary or reasonable to protect its security interest in the Collateral. Borrower authorizes Bank to enter and, at Bank's discretion, secure any premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest or compromise any encumbrance, charge or lien on the Collateral which in Bank's determination appears to be prior or superior to its security interest or lien, and to pay all expenses incurred in connection therewith;

(g)     Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, lease, license or other disposition, advertise for sale, lease, license or other disposition, and sell, lease, license or otherwise dispose of (in the manner provided for herein or in the Code) the Collateral. Bank is hereby granted a license or other right to use, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any asset of a similar nature, pertaining to the Collateral, in completing the production of, advertising for sale, lease, license or other disposition, and sale, lease, license or other disposition of the Collateral, Borrower's rights under all licenses and all franchise agreements shall inure to Bank's benefit;

(h)     Sell, lease, license or otherwise dispose of the Collateral at either a public or private sale or proceeding, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Borrower's premises) as Bank determines is commercially reasonable. It is not necessary that the Collateral be present at any such sale;

(i)     Bank shall give notice of the disposition of the Collateral as follows:

(1)     To Borrower and any bankruptcy trustee of Borrower and all other parties entitled to receive a notice of disposition under the Code or who have made a written request to Bank for notice, notice in writing of the time and place of public sale or other disposition or, if the sale or other disposition is a private sale or some disposition other than a public sale, then the time on or after which the private sale or other disposition is to be made;

(2)     The notice hereunder shall be personally delivered or mailed, postage prepaid, to Borrower at the address set forth in its Chapter 11 petition and to any bankruptcy trustee of Borrower, at least ten (10) calendar days before the date fixed for the sale or other disposition, or at least ten (10) calendar days before the date on or after which the private sale or other disposition is to

6

be made, unless the Collateral is perishable or threatens to decline speedily in value. Notice to persons other than Borrower claiming an interest in the Collateral shall be sent to such addresses as is required or authorized under the Code;

(j) Foreclose or otherwise execute its rights and remedies under any or all of the Mortgages or any collateral assignments of leases and rents on any real estate;

(k) Bank may credit bid and purchase at any public sale: and

(l) In addition to the foregoing, Bank shall have all rights and remedies provided by law (including those set forth in the Code) and any rights and remedies contained in any Loan Documents and all such rights and remedies shall be cumulative;

13. **Grant of Continuing Security Interest.** Borrower (as debtor and as debtor in possession) hereby grants to Bank a continuing security interest in all presently existing and hereafter acquired or arising Collateral in order to secure prompt repayment of the Obligations and in order to secure prompt performance by Borrower of each and all of its covenants and Obligations under the Loan Documents and otherwise. To the extent that the Collateral consists of "Collateral" as that quoted term is defined in the Loan Agreement, such term shall be deemed to include all real estate of the Borrowers wherever located. **Borrower hereby confirms, reaffirms and restates the prior grant to Bank of continuing security interests and liens in the Collateral. Bank's continuing security interest and lien in the Collateral shall attach to all Collateral without further act on the part of Bank or Borrower.**

14. **Facility Fee.** In consideration of Bank's entering into this Modification Agreement, Borrower shall pay Bank a facility fee of $7,500.00, which fee shall be fully earned and payable in full upon the execution hereof and the entry of the Financing Order. Borrower acknowledges and agrees Bank may ask for additional facility fees if it is willing to extend the Termination Date as provided for herein.

15. Borrower represents that, subject to approval of the Bankruptcy Court (with respect to (a), (b), (d) and (e):

(a) no consent or approval of, or exemption by any person or entity is required to authorize, or is otherwise required in connection with the execution and delivery of this Modification Agreement and any other Loan Documents provided for herein, which has not been obtained and which remains in full force and effect, including, without limitation, the Financing Order;

(b) Borrower has the power to execute, deliver and carry out this Modification Agreement and all documents executed in connection herewith, and this Modification Agreement and such other documents are valid, binding and enforceable as against Borrower in accordance with their terms;

(c) except for the events precipitating the filing of the aforementioned bankruptcy case, no material adverse change in the financial condition of Borrower has occurred since the date of the most recent financial statements of Borrower submitted to Bank, and the information contained in said statements and reports is true and correctly reflects the financial condition of Borrower as of the dates of the statements and reports, and such statements and reports have been prepared in accordance with GAAP

7

and do not contain any material misstatement of fact or omit to state any facts necessary to make the statements contained therein not misleading;

(d) An applicable Financing Order has been duly entered, is valid, subsisting and continuing and has not been vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by Bank) and is not subject to any pending appeal or stay, request for modification, amendment, reconsideration or vacatur; and

(e) Upon the entry of a Financing Order the Obligations: (a) shall at all times constitute a Super-Priority Administrative Expense having priority, pursuant to Sections 364(b) and 364(c)(1) of the Bankruptcy Code, over any other claims of any entity, including, without limitation, any claims under Sections 503, 507, 1113, and 1114 of the Bankruptcy Code, and (b) pursuant to Sections 364(c)(2) and (3) and 364(d) of the Bankruptcy Code, shall at all times be secured by a first priority perfected lien in all of the assets, whether now owned or hereafter acquired of Borrower and its estate, pursuant to the terms of the Loan Documents, subject only to the Carve Out and to the Permitted Prior Liens.

16. Borrower, subject to approval of the bankruptcy Court, agrees to pay any and all expenses, including reasonable counsel fees, including allocated fees of in-house counsel, and fees of outside counsel, and disbursements, incurred by Bank in connection with the preparation and execution of this Modification Agreement and all other documents executed in connection herewith, and entry of the Financing Order, and hereafter incurred with respect to the Obligations of Borrower to Bank and the Case.

17. This Modification Agreement is intended to supplement and modify the Loan and Security Agreement dated as of August 30, 2006, between Bank and Borrower as heretofore modified and amended and the rights and obligations of the parties under said Loan and Security Agreement shall not in any way be vacated, modified, amended or terminated except as expressly provided herein. All terms and conditions contained in each and every agreement or promissory note or other evidence of indebtedness of Borrower to Bank are incorporated herein by reference. If there is a conflict between any of the provisions heretofore entered into and the provisions of this Modification Agreement, then the provisions of this Modification Agreement shall govern.

18 This Modification Agreement shall be construed in accordance with the substantive laws of the State of New Jersey without regard to conflict of laws.

19. Fletcher Granite Company of Georgia, LLC, notwithstanding that it is not a debtor under the Bankruptcy Code, hereby agrees to be bound by all of the terms and conditions of this Modification Agreement as if it was a co-debtor under the Bankruptcy Code with Fletcher Granite Company, LLC and agrees to be bound by the terms of any Financing Order entered by the Bankruptcy Court.

8

IN WITNESS WHEREOF, the parties hereto have caused this Modification Agreement to be executed and delivered as of the day and year first above written.

Fletcher Granite Company, LLC.
As debtor and debtor-in-possession
By:

By: _____
Name: STEVEN C. PETRARCA, DIRECTOR
Title: ~~President~~ The O'Connor Group, CRO


Fletcher Granite Company of Georgia, LLC
By: Its Manager, Fletcher Granite Company, LLC

By: _____
Name: STEVEN C. PETRARCA, DIRECTOR
Title: ~~President~~ The O'Connor Group, CRO
Fletcher Granite Company, LLC


Sovereign Business Capital
Division of Sovereign Bank

By: _____
Name:
Title:

9

IN WITNESS WHEREOF, the parties hereto have caused this Modification Agreement to be executed and delivered as of the day and year first above written.

        Fletcher Granite Company, LLC,
        As debtor and debtor-in-possession
        By:

        By:_____
            Name:
            Title: President


        Fletcher Granite Company of Georgia, LLC
        By:

        By:_____
            Name:
            Title: President


        Sovereign Business Capital
        Division of Sovereign Bank

        By: *Dwight F. Fairchild* (signature)
            Name: Dwight F. Fairchild
            Title: Sr. Vice President

9